In the Matter of the Probate of the Alleged Will of JOHN
SPRINGSTEAD, Deceased.

*Supreme Court, Fifth Department, General Term, December 30, 1889.*

1. *Evidence. Will.*—The fact that some of the testator's children instituted
   proceedings to have him declared a lunatic, is competent evidence, on
   the probate of his will, simply in order to account for an alleged prej-
   udice which the contestants claimed constituted a delusion ; but the
   record of such proceedings is incompetent to establish his testamentary
   capacity.
2. *Will.    Undue influence.*—Where the testator entered into a written con-
   tract with a woman to become his housekeeper, while he lived, where-
   by he was to will her in return his land, or, if both agreed to terminate
   the contract, then a specified sum per annum, the relation existing
   between them cannot be regarded as confidential, and the rules in re-
   gard to undue influence do not apply.
3. *Same.*—The rule as to confidential relations is confined to cases of con-
   tracts and gifts *inter vivos* and does not apply in all its strictness
   to testamentary gifts.
4. *Same.*—Undue influence cannot be presumed, but must be proved.

Appeal from the decree of the surrogate of Chautauqua
county, denying probate to an instrument purporting to be
the last will and testament of John Springstead, deceased,
late of the town of Portland.   The will bears date the 16th
day of December, 1885, and the decedent died on the 20th
day of January, 1887, at the age of seventy-four years.   The
property devised consisted of a small farm of the value of
about $2,500, his personal property having little or no value.
The decedent's wife died in the year 1880, and at that time
his family consisted of three children, two sons and one
daughter.   The latter was the wife of H. S. Ellis to whom
he had been married for the period of twenty years.   His
sons were unmarried, one living in the west, and the other

lived with him at the homestead farm until they went to live with Mrs. Ellis. In January, 1884, up to which time since the death of his wife the decedent and his son George lived alone on the farm, he accepted an invitation from his daughter, Mrs. Ellis, to make his home with her, which he did until July, 1885. In November, 1885, he entered into a written agreement with Mrs. Minerva L. Tefft, who was a sister of his late wife, by the terms of which she agreed to move on to the decedent's farm and become his housekeeper, to do the house work, cooking, washing, and mending, to nurse and care for him in sickness, in a kind manner during his natural life. And the decedent agreed to furnish a home for Mrs. Tefft and her adopted daughter so long as the latter should live with Mrs. Tefft and assist her in performing the household duties.

The testator on his part agreed, in consideration of the labor to be performed by Mrs. Tefft, that he would at his death will the farm to Mrs. Tefft in fee simple. The contract contained the further clause that if Mrs. Tefft should die before the testator then he should pay to the said niece and adopted daughter of Mrs. Tefft, at the rate of $150 a year from the date of the contract to the time of her death, and the same should be a lien on the premises. It was further agreed that if the parties should mutually consent to the abandonment of the contract, then the said testator should pay to Mrs. Tefft $150 a year from the date of the contract, up to the time of the termination of the agreement. The will devised the farm to Mrs. Tefft after the payment of all his just debts and funeral expenses, which were made a lien upon the land until paid. The probate of the will was contested by Mrs. Ellis and her brother, Charles, who lived in the west, upon the ground that their father at the time of the making of the will was of unsound mind and memory, and had not testamentary capacity, and that the same was procured by the fraud and undue influence of Mrs. Tefft. From the decree Mrs. Tefft appeals.

*H. C. Kingsbury*, for appellant.

*Charles D. Murray*, for respondent.

BARKER, P. J.—We are unable to concur with the conclusions of the learned surrogate, that the decedent did not possess testamentary capacity at the time he executed the instrument propounded as his last will and testament. When in the prime of life the decedent was a man of common intelligence, sober and industrious, and enjoyed the full respect and confidence of his neighbors and acquaintances. The contestants claim that after the death of his wife his mental and physical condition became greatly impaired, and, at the time of the making of the will, he was reduced to a state of idiotic *dementia;* that he labored under the insane delusion that two of his children, his son, George, and his daughter, Mrs. Ellis, had withdrawn their love and affection for him, and had become his enemies. That his mind and memory were much impaired was conceded by the proponents, when compared with his earlier years, when his physical and mental faculties were not impaired either by age or sorrow. There was a large number of witnesses examined on both sides of the question as to the state of his mind, most of them having been acquainted with him for many years, and some of them were his immediate neighbors.

In our brief discussion of the facts of the case, we shall not refer to much of the voluminous evidence set forth in the case. Aside from the provision contained in the will, which disinherited his children by devising all of his property to another, the evidence does not disclose much that indicates that the decedent was of unsound mind, as that term is understood in its legal sense. We think that that fact has an explanation in view of the facts and circumstances of this case, which is consistent with the contention that the testator possessed testamentary capacity. The statute provides that all persons except "idiots, persons of

unsound mind, * * * and infants, * * * may give and devise their real estate by will executed in due form."

Up to the time of the death of his wife the decedent managed his farm and provided for his family in such a manner as not to elicit comment from his children or his neighbors. No one intimates that up to that time he had not a sound mind and memory. As we understand from the case, for three years after the death of his wife, he and his son George continued to reside on the farm alone, without the assistance of a housekeeper. He then accepted an invitation from his daughter, Mrs. Ellis, to make his home with her, which he did for the period of eighteen months, who bestowed on her father kind and proper attention. But it is disclosed by the evidence that he was unhappy and discontented, and was desirous of returning to his farm and living there the remainder of his days, resuming the personal management of the same. Mrs. Ellis' house was within the depot grounds very near the railroad station, and he complained that the noise of the cars in the night time disturbed his sleep and prevented him from securing proper rest. The case discloses that he was willing to secure to his children, or either one of them, all his property, if either of them would care and provide for him at his home on the farm, and none of them were willing to accept his proposition. In view of the location of the farm and its value, his age, and the occupation and places of residence of his children, it is quite apparent that neither of them could accept his offer without considerable sacrifice of property and comfort. Neither of the children except Mrs. Ellis was so situated in life that they could offer a comfortable home to their father. It was disclosed on the hearing, though perhaps not proved in a proper manner, that some two or three months before the decedent left the home of the daughter, that she and his son George instituted proceedings against him for the purpose of having him declared a lunatic, incapable of the management of his property, and to have a committee appointed to take charge

of his person and estate, and that a jury was summoned and heard the evidence, and that they called before them the decedent and examined him, and they unanimously found by their written verdict that he was of sound mind and memory, and capable of taking care of himself and the management of his property. After those proceedings were terminated he made his home with Mrs. Tefft, who resided near his homestead, and he at once negotiated with the tenant occupying his farm for a surrender of the lease that he might re-enter and establish his home, with Mrs. Tefft as his housekeeper, and resume the management of his property.

We think that the evidence discloses that by the institution of these proceedings the testator felt greatly wronged and injured, and entertained in some degree indignant feelings towards his children who instituted the proceedings. Undoubtedly the occasional expressions made by the decedent that his children had turned against him, and wanted to send him to the poor house, grew out of the fact that they sought to put the control of his person and property in the hands of a committee. We do not mean to intimate, however, that the record of those proceedings would be competent evidence to prove the fact at issue, that the deceased had testamentary capacity, but it was competent to prove that those proceedings were instituted and a hearing had, simply for the purpose of explaining and giving character and meaning to the action of the testator, in leaving the home of his daughter, and uttering the expressions which he did as to his opinion of her feelings towards him. His farm was only two or three miles from the home of Mrs. Ellis, and her brother George was engaged in business in the neighborhood and made his home with her. It is a very significant circumstance in this case that neither of them ever paid a visit to their father after he left the home of Mrs. Ellis, when it was so near their own.

Mr. and Mrs. Ellis were informed of his death and neither attended his funeral, and no explanation was given

for their absence. There is abundant evidence indicating that the ill-feeling and resentments were mutual. If the children believed that their father was the imbecile that they now claim he was, their neglect and want of attention may be criticized with severity. These circumstances, together with the desire of the testator to have his home on his own farm where he had resided so long, indicate the inducements which led him to make the contract with his sister-in-law, Mrs. Tefft, and without some other evidence of his want of understanding, the arrangement cannot be altogether condemned as irrational.

Several witnesses were called who related what they had observed as to the changes in the mental and physical condition of the deceased, but after reading their evidence with attention, we are unable to reach a conclusion from the facts and circumstances which they state, that he did not possess testamentary capacity. One of these witnesses was a justice of the peace, and during the time covered by his evidence he prepared contracts relative to the management of the farm which were executed in his presence by the decedent.

Another justice of the peace, residing in the same town, was called by the contestants, who testified in a general way that the decedent's mental faculties were impaired, and that his conduct was foolish, yet he too prepared papers with the consent of the testator's children, expecting that they would be executed, and they related to the disposition of his property. After the decedent had made the agreement with Mrs. Tefft, his near-by neighbors, who saw him the most frequently of any of his acquaintances, were of the opinion that he managed his property with common prudence, and that he appeared very much as he did at the time he left the same and went to live with Mrs. Ellis. In considering this branch of the case we fully agree with the learned counsel for the respondents, that to make a valid will, the testator must be of sound and discerning mind and memory, and have sufficient capacity to comprehend perfectly the condition of his property; his

relations to the persons who were, or who should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will, or, to use the language of the cases, he must have "sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient time to observe at least their obvious relations to each other, and to be able to form some rational judgment in relation to them."

On the other question of fact found by the surrogate, that the will was produced by the undue influence of the devisee, we are also unable to concur in his conclusions. There is scarcely any direct evidence that Mrs. Tefft attempted to exercise any influence over the testator relative to the making of the contract, or the will, aside from the circumstance that they together visited the lawyer who prepared both of those instruments.

The provisions of the contract and the will were fully talked over and discussed between the testator and his counsel, in the absence of Mrs. Tefft, and he testifies that he was unable to discover that Mr. Springstead had been influenced in his action by Mrs. Tefft or any other person. In support of the findings on this issue, the counsel for the respondent contends that the relations existing between the testator and the devisee were confidential in their nature and character, and that the law presumed that the provisions for the benefit of the latter were secured by means of improper influences exercised by her, and that the burden of proof was cast upon the devisee to show that the provisions of the will were the free and voluntary act of the testator.

The rule, as stated, has no application to this case. The relations existing between the testator and devisee were entirely conventional, and have their foundation in the contract, and the terms of the will were but carrying into effect one of the specific provisions of the agreement. Undue influence, which is characterized as a species of fraud when relied upon

to annul a transaction *inter partes*, or a testamentary disposition, must be proved, and cannot be presumed; yet the relation in which the parties stand to each other is often a material circumstance, and may of itself in some cases be sufficient to raise a presumption of its existence. *In re* Will of Smith, 95 N. Y. 516.

In that case it was said " that transactions between guardian and ward, attorney and client, trustee and *cestui que trust*, or persons, one of whom is dependent upon, and subject to, the control of the other, are illustrations of this doctrine." But the rule to which reference is made is confined to cases of contracts or gifts *inter vivos*, and does not apply in all its strictness to gifts by will. It has been held that the fact that the beneficiary was the guardian, attorney, or trustee of the decedent, does not alone create a presumption against a testamentary gift, or that it was produced by undue influence. Coffin *v.* Coffin 23 N. Y. 9; Post *v.* Mason, 91 Id. 539; *In re* Will of Smith, *supra*.

If the testator had survived Mrs. Tefft, then his obligation would have been limited to paying to her adopted daughter the sum of $150 a year for her services as housekeeper.

Such was the expressed terms of the written agreement, and the devise in the will would have lapsed by reason of the happening of that event. Undue influence in cases of this character is never to be presumed. It must be shown by evidence legitimately proving the fact, and when it is established the will cannot be admitted to probate, for the reason that it is not the will of the testator. Upon this branch of the case the evidence is too scant, doubtful and uncertain to allow us to follow the conclusion of the learned surrogate that the will was produced by the undue influence of the devisee.

As the conclusions which we have reached do not in this case finally dispose of the issues, we have less hesitancy than we otherwise would have in disagreeing with the result

reached by the learned surrogate, whose judgments are always considered with great respect by this court.

The decree is reversed, and the questions of fact presented by the contestant's answer are to be tried by a jury at a circuit court to be held in and for Chautauqua county, and the costs of this appeal to be disposed of by the subsequent proceedings to be had in the surrogate's court. The form of the order to be settled by MACOMBER, J.

DWIGHT and MACOMBER, JJ., concur.